UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PAUL SCHUMACHER,
                       Plaintiff,

   -against-                                       1:08-CV-01038 (LEK/DRH)

GRANITE SERVICES, INC.,

                       Defendant.
_____

## MEMORANDUM-DECISION and ORDER

### I.    INTRODUCTION

On September 30, 2008, Plaintiff Paul Schumacher ("Plaintiff" or "Schumacher") filed this action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"), having received a right to sue letter from the United States Equal Employment Opportunity Commission ("EEOC") dated June 30, 2008. Dkt. No. 1 ("Complaint"); Dkt. No. 1-2 at 2. Plaintiff also alleges violations of the Americans with Disabilities Act ("ADA") and the New York State Human Rights Law ("NYSHRL"). Compl. ¶ 1. Defendant Granite Services, Inc. ("Defendant" or "Granite Services") filed a Motion for summary judgment (Dkt. No. 33) ("Motion") on April 1, 2010, and Plaintiff responded with a Motion in opposition on April 20. Dkt. No. 37 ("Opposition"). Defendant filed its Reply to Plaintiff's Opposition on April 26. Dkt. No. 41 ("Reply"). For the following reasons, Defendant's Motion is denied in part and granted in part.

### II.    BACKGROUND

Plaintiff is a former employee of Granite Services, Inc., a Delaware corporation and wholly-owned subsidiary of General Electric Company ("G.E."),[1] with its principal place of business in

---

[1] G.E. was a defendant in this action but was dismissed on January 8, 2010, pursuant to a Stipulation and Order of dismissal consented to by G.E. and Plaintiff. Dkt. No. 26.

Tampa, Florida. Defendant's Statement of undisputed material facts (Dkt. No. 33-43) ("DSMF") ¶¶ 2-4; Compl. ¶ 6. Granite supplies a contingent workforce to provide engineering and technical services to G.E., its primary customer. DSMF ¶ 5. Plaintiff was hired by a Granite subsidiary, ProTech Professional and Technical Services, in 1999 and worked for two more Granite subsidiaries before he became directly employed by Granite in 2007. Plaintiff's Response to Defendant's statement of undisputed material facts (Dkt. No. 36) ("PRSMF") ¶ 2.

**A. Plaintiff's Employment Prior to January 23, 2007**

As discussed below, the nature and requirements of Plaintiff's job is a source of significant dispute between the parties. Plaintiff's official job title was that of an "instrumentation specialist." Id. Defendant has introduced a number of "job descriptions" of that position into evidence, but Plaintiff claims that he never saw any of these job descriptions, that they must have been created after his termination, and that "they were not considered to be operative documents by Granite's own management." Plaintiff's Memorandum of law in opposition to Defendant's motion for summary judgment (Dkt. No. 37) ("PML") at 9.

In any event, the following is not disputed: In his work as an instrumentation specialist, Plaintiff conducted performance testing on gas and steam turbines manufactured and sold by G.E. PRSMF ¶ 7. These turbines are located at both domestic and international power generation facilities ("field sites"); Plaintiff was required to travel to the field sites to which he was assigned, and he estimates that he traveled for about twenty to fifty percent of the time during his employment. Id. ¶ 8; DSMF ¶ 7. According to Plaintiff's estimates, he would travel to the field sites alone about seventy percent of the time, but for about thirty percent of his trips he was accompanied by another instrumentation specialist "for large, complex jobs, and for training

purposes," and Granite would only bill G.E. for the time of one instrumentation specialist. DSMF ¶¶ 10-12; PRSMF ¶¶ 10-12. When he was not assigned to a field site, Plaintiff was working at Granite's laboratory in Rotterdam, New York, primarily recalibrating the testing instruments for shipment to and use at other field sites. DSMF ¶ 7.

As part of a variable work force agreement ("VFW agreement") between Granite and G.E., all instrumentation specialists, including Plaintiff, became employed by Granite effective January 1, 2007. Id. ¶ 32. By recommendation of his direct supervisor, Kevin Lackner ("Lackner"), Plaintiff, who was seventy years old at the time, was offered and accepted an at-will contract of re-employment pursuant to the VFW agreement. Id. ¶ 37. Under this contract, Plaintiff was required to be on call for immediate departure on a travel assignment until he had reached 1,500 customer billable hours. Def. Ex. 4 (Dkt. No. 33-46) at 17. According to the contract, Plaintiff was permitted to decline future travel assignments once he had reached 1,500 billable hours. Id. The physical requirements and job responsibilities of an instrumentation specialist while on field sites remained the same. DSMF ¶ 43. Although Plaintiff was required to travel under the new contract, other instrumentation specialists were able to work primarily in the Rotterdam laboratory and were required to travel either very little or not at all. Id. ¶ 49. The instrumentation specialists in the laboratory usually worked forty hours per week with occasional overtime. Id. ¶ 50.

**B. Plaintiff's Heart Attack and Subsequent Medical Issues**

On January 23, 2007, Plaintiff suffered a massive heart attack in his home and nearly died. DSMF ¶¶ 52-53. He was taken to Albany Medical Center and required emergency medical interventions to save his life. Id. ¶ 54. He went into full cardiac arrest and respiratory failure, and his initial prognosis was extremely guarded. Id. As a result, one of Plaintiff's arteries remains

completely blocked. Id. ¶ 56.

Plaintiff remained at Albany Medical Center until February 15, 2007, and was rehospitalized from March 2, 2007 until March 30, 2007, because of severe low blood pressure. Id. ¶ 57. During his second hospitalization, Plaintiff had an internal biventricular defibrillator ("IBD") implanted in his heart. Id. An IBD is more complex than an ordinary pacemaker and is implanted to save a patient from otherwise fatal cardiac arrhythmia. Id. Plaintiff's IBD can shock his heart back into a normal rhythm, but it does not work instantly; Plaintiff may still briefly lose consciousness before the IBD corrects any arrhythmia. Id. ¶ 71.

After Plaintiff's second discharge from the hospital, he participated in a cardiac rehabilitation program from April 2007 to August 2007. DSMF ¶ 59. A progress report from the program dated August 13, 2007, noted that too much exercise could cause Plaintiff's heart rate to spike and recommended that Plaintiff limit himself to "moderated" aerobic exercise and continue to participate in the rehabilitation program. Id. ¶¶ 60, 66-67. Plaintiff continues to experience occasional lightheadedness and fatigue due to a low "ejection fraction" (the rate at which the heart pumps blood). Id. ¶¶ 61-69. Although Plaintiff can perform daily chores and activities, his doctors have restricted him from lifting more than 20 pounds. Id. ¶¶ 73-74.

**C. Plaintiff's Termination**

In May 2007, Plaintiff reported to Lackner that he could return to work as soon as he completed his cardiac rehabilitation program, but that he would require work limitations, including "rest breaks, no heavy lifting and no travel." DSMF ¶ 75; Compl. ¶ 23. Plaintiff submitted his insurance company ("CIGNA")'s "medical request form," which had been completed by one of Plaintiff's health care providers, in support of his request. DSMF ¶ 66. In addition to listing the

aforementioned necessary work restrictions for Plaintiff, the medical request form contains a box checked "Yes" in response to the question: "Could your patient return to work at this time if accommodations were made for the listed restrictions?" Def.'s Ex. 8 (Dkt. No. 33-46) at 21.

On May 11, 2007, Plaintiff attended a company picnic at Granite's warehouse, where Lackner and another Granite employee, Roman Karpishka ("Karpishka"), informed Plaintiff that he was going to be fired. Roman Karpishka Dep. Tr. (Dkt. No. 40-8) 88:19 - 92:1. Based on the record and the parties' submissions, it appears that Plaintiff asked if he could be reassigned to work in the laboratory to replace Scott Kaine, an instrumentation specialist who would soon be leaving the laboratory and thereby creating a vacancy. See Def.'s Mem. at 11; Pl.'s Opp. Mem. at 13-14; Schumacher Dep. Tr. 98:11-12; 106:8-20. Plaintiff claims that Karpishka responded by telling him that "they somebody younger to do heavy lifting"; Karpishka denies having said this or otherwise having made any reference to Plaintiff's age, and Lackner states that Karpishka's response to Plaintiff "was, based on the medical condition here that, no, [Plaintiff] wouldn't be able to perform that job as well." Schumacher Dep. Tr. 106:8-20; Karpishka Dep. Tr. 99:6-12; Lackner Dep. Tr. 34:14-16. Plaintiff's termination was effective on June 1, 2007. PRSMF ¶ 2. On June 4, 2007, Granite hired Daniel Brown, who is "in his late thirties or forties," to replace Kaine. DSMF ¶ 86; Compl. ¶ 31.[2]

Through CIGNA Plaintiff received a combination of New York state disability benefits, short-term disability benefits, and long-term disability benefits from January 31, 2007 until April 23, 2008. DSMF ¶ 97. From time to time, CIGNA requested documentation from Plaintiff's health

---

[2] Although Plaintiff purports to have submitted the transcript of his deposition, Kaine's, and Brown's in full, they do not appear to have been filed on the docket. Kim Aff. (Dkt. No. 40) ¶¶ 18-20. Defendant submitted select portions of Plaintiff's transcript that the Court considers and that provide sufficient support for Plaintiff's factual allegations on this point.

care providers to attest to his continuing need for long-term disability benefits. Id. ¶103. CIGNA made its most recent request in November 2007 to one of Plaintiff's treating cardiologists, Dr. Nicholas Kondo. Id. Dr. Kondo completed a CIGNA medical request form in which he opined that Plaintiff could not return to work until his ejection fraction improved. Id. ¶ 105. Dr. Kondo also stated that Plaintiff would "never" be able to return to work without restrictions, and would "probably never" be able to do so even with restrictions. Id. CIGNA continued Plaintiff's disability benefits until they were exhausted on April 24, 2008.

### III.    STANDARD OF REVIEW

Rule 56 of the Federal Rules instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

However, if the moving party has shown that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150

(2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). The Court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Additionally, the Second Circuit has directed district courts to "be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999); see also Gallo, 22 F.3d at 1224 ("Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."). Lastly, the Court also applies the above standard to age and disability discrimination claims brought pursuant to the NYSHRL. Carras v. MGS 782 Lex, Inc., 310 F. App'x 421, 422 n.1 (2d Cir. 2008); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

**IV.   DISCUSSION**

   **A. Disability Claims**

In adjudicating claims under the ADA, courts must utilize the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To survive summary judgment under this framework, a plaintiff must establish a *prima facie* case of discrimination by showing that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,

198 F.2d 68, 72 (2d Cir. 1999) (citation omitted). Once the plaintiff has satisfied this burden, the defendant must provide a legitimate non-discriminatory reason for the discharge, at which point the plaintiff must then "carry the burden of persuasion that the proffered reason is a pretext." Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citing Heyman, 198 F.3d at 72).

Defendant does not dispute that it is an employer covered by the ADA, that Plaintiff was disabled within the meaning of the ADA, or that he was fired because of his disability. Hence, Defendant claims that summary judgment in its favor is warranted only the basis of the third prong. According to Defendant, the limited work requirements for Plaintiff's post-cardiac rehabilitation rendered him unqualified to perform the essential functions of a travel instrumentation specialist, and Defendant could not make reasonable accommodations to enable him to work in that job.[3] Defendant's Memorandum of law in support of summary judgment (Dkt. No. 33-44) ("Def.'s Mem.") at 8-18.

*1. Essential Functions*

---

[3] Defendant also objects to Plantiff's submission of two affidavits, one from Dr. Edward Philbin, one of Plaintiff's treating cardiologists, and one from Mary Alice Norton, a nurse practitioner. Def.'s Mem. at 6-8. Both affidavits state that Plaintiff could have returned to his former position "sometime on or about the summer/fall of 2007" with the only restriction of not lifting more than 20 pounds. Norton Aff. (Dkt. No. 38) ¶ 6; Philbin Aff. (Dkt. No. 39) ¶ 12. Defendant claims that these affidavits contravene Plaintiff's "judicial admissions" in his Complaint that his required work restrictions were rest breaks, no heavy lifting, and no travel. Def.'s Mem. at 7; Compl. ¶¶ 22-23. For purposes of this Motion, the Court will consider that the accommodations Plaintiff requested in order to perform his job were as stated in his Complaint: rest breaks, no heavy lifting, and no travel. Indeed, Plaintiff appears to concede that he would have required those restrictions, at least at the time of his termination in May 2007. See Pl.'s Opp. Mem. at 12. However, the Court also notes that the Philbin and Norton affidavits may be considered by a factfinder to the extent that they support Plaintiff's argument that his medical condition was improving; such statements do not contravene any of the admissions in Plaintiff's Complaint. See Philbin Aff. ¶ 11 (stating that between February and October 2007, Plaintiff's "overall health and heart function improved steadily as a result of chronic medical therapy and cardiac rehabilitation"); Norton Aff. ¶ 5 (same).

According to Defendant, the "essential functions" of Plaintiff's job included travel to field sites as well as "climbing on ladders and scaffolding, working on and around unprotected heights . . . lifting/carrying up to 50 pounds," and "frequent bending and other quick position changes to install test equipment on turbines." Def.'s Mem. at 10. Plaintiff disagrees: While "Granite would have this Court believe that the essential functions of an instrumentation specialist were akin to a colony of Supermen," he argues, "the actual experiences of past and present Granite employees . . . show that the actual functions of the instrumentation specialists were much less strenuous and more fluid." Pl.'s Opp. Mem. at 10.

Federal regulations provide that a number of factors may be considered in determining whether a function is essential, including: (1) the employer's judgment as to which functions are essential; (2) written job descriptions created for advertising or interviewing applicants; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the experiences of past incumbents in the job; and/or (7) the current experiences of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3). Additionally, while "[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position . . . ultimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004) (citations, quotation marks and alterations omitted).

The Court has reviewed the record, considered the above factors, and finds that genuine disputes of fact exist on this issue. According to Defendant, when Granite and G.E. agreed that the instrumentation specialists would all become Granite employees in January 2007, Granite divided

the instrumentation specialists into two groups: "100% travel instrumentation specialists" and "lab instrumentation specialists." DSMF ¶ 32. Plaintiff denies that this occurred and points to the fact that "[e]ven after [January 1, 2007] there were a number of instrumentation specialists who were exceptions to this purported 'split.'" PRSMF ¶ 32. For example, Plaintiff claims, one instrumentation specialist's sole function was to monitor and install computer equipment at power plants, and at least two other "so-called 'traveling instrumentation' specialists . . . even after January 1, 2007 worked in the lab." Id. And while at least one instrumentation specialist may have been fired for refusing to travel, Plaintiff points to other instrumentation specialists who were permitted to cease traveling because of personal preferences or, in one situation, to accommodate a broken leg. Id. ¶¶ 7, 40; see also DSMF ¶¶ 34, 40. The Court concludes that Plaintiff has introduced sufficient evidence to raise genuine issues of fact as to whether travel was an essential function of Plaintiff's job.

The parties also contest whether lifting, climbing, and packing instruments at the Rotterdam laboratory constitute essential functions of Plaintiff's job. According to Defendant, Plaintiff and the other instrumentation specialists in the lab were often required to lift, pack, and unpack instruments weighing up to 50 pounds. DSMF ¶ 29. Plaintiff counters that this "was a very small part of the instrumentation specialists['] job by 2006 and was reduced even further after [January 1, 2007]." PRSMF ¶ 31. Defendant cites one June 2007 posting for an instrumentation specialist position that specifically requires applicants to be able to lift up to 50 pounds, but Plaintiff claims that there were no written job descriptions for the instrumentation specialists in the time that he worked for Granite. PRSMF ¶ 47; Pl.'s Ex. H (Dkt. No. 37-7). Conversely, at least one "instrumentation specialist" who technically was assigned to calibrate equipment in the laboratory eventually evolved into a

"shipping specialist" who tracked shipments in addition to occasionally calibrating equipment. Karpishka Dep. Tr. 146:12 - 148:19. This would support an inference that, similarly, an instrumentation specialist might focus more on calibrating equipment and spend less time assisting with lifting, packing, and unpacking. For all of these reasons, the Court considers that a reasonable factfinder could accept Plaintiff's characterization of the instrumentation specialist job as one that was fairly fluid and did not necessarily require him to lift heavy equipment. See Russo v. Sysco Food Servs. of Albany, LLC, 488 F. Supp. 2d 228, 235-36 (N.D.N.Y. 2007) (where position of transportation supervisor required truck driving only "on occasion," question of fact existed as to whether epileptic plaintiff who could not drive may nonetheless have been able to work as transportation supervisor); Whitlow v. Visiting Nurse Ass'n of Western N.Y., 420 F. Supp. 2d 92, 107 (W.D.N.Y. 2005); Picinich v. United Parcel Serv., 321 F. Supp. 2d 485, 505 (N.D.N.Y. 2004).

*2. Reasonable Accommodations*

For similar reasons, the Court also finds that questions of fact exist on the issue of whether Plaintiff could have worked as an instrumentation specialist had he been provided with reasonable accommodations. Reasonable accommodations may include but are not limited to: (1) "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position . . . appropriate adjustment or modifications of examinations, training materials, or policies; . . . and other similar accommodations." 29 C.F.R. § 1630.2(o)(2)(ii). The ADA "does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable.'" Fink v. N.Y. City Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995). "The question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis." Gronne v. Apply Bank For Sav., 1 F. App'x 64, 67

(2d Cir. 2001) (summary order) (quoting Wernick v. Fed. Reserve Bank, 91 F.3d 379, 385 (2d Cir. 1996)) (internal quotation marks omitted).

Defendant first argues that, as a matter of law, it was not required to accommodate Plaintiff because at the time of his termination he was still on medical leave; "there was no certain end date for Plaintiff's cardiac rehabilitation program, and no reasonable assurance that he would be medically fit to return to work thereafter." Def.'s Mem. at 13. But the fact that Plaintiff's prognosis was unclear at the time of his termination does not compel a finding that, as a matter of law, he was unqualified to work with reasonable accommodations at his job. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 335-36 (2d Cir. 2000) (reversing grant of summary judgment where employee's "medical condition at the time of his termination is far from clear" and records plausibly indicated that his condition had been improving such that he could have soon returned to work on a part-time basis).

Second, as with its argument on the "essential functions" question, Defendant's argument that no reasonable accommodations would have enabled Plaintiff to work in his position rests largely on the premise that Plaintiff's position was specifically that of a "100% travel instrumentation specialist." See Def.'s Mem. at 11-16. In Defendant's view, then, the only possible "reasonable accommodation" for Plaintiff's condition would have been a transfer to a wholly separate position such as the "lab instrumentation specialist" position, which, Defendant also contends, included essential functions that Plaintiff would have been incapable of performing. Id. 13-15. Plaintiff disputes this characterization of the "instrumentation specialist" position as overly narrow, and objects to Defendant's characterization of heavy lifting as an essential function of an instrumentation specialist's work in the laboratory. Plaintiff contends that the instrumentation

specialist position encompassed both laboratory and field work, and that Plaintiff could have worked in the laboratory with rest breaks and no heavy lifting.  Further, Kapishka testified that although the company "had to . . . make these levels and change the wording around, but . . . this instrumentation specialist [title] applies to calibration people in the lab."  Id. 129:7-11.  And, as referenced above, Plaintiff has provided individual examples of other instrumentation specialists that would support an inference that Plaintiff could have returned to work in that capacity with reasonable accommodations.

In sum, the parties' submissions make clear that the dispute as to the nature of Plaintiff's instrumentation specialist position lies at the heart of this issue, and it is a factual dispute, not a legal one.  A reasonable factfinder could infer from the evidence that Plaintiff's actual job was, as Defendant calls it, a "100% travel instrumentation specialist," in which case Plaintiff would be required to demonstrate that Defendant denied him reasonable accommodations in refusing to reassign him to a different position – that of a "laboratory instrumentation specialist."  See Medlin v. Rome Strip Steel Co., Inc., 294 F. Supp. 2d 279, 291 (N.D.N.Y. 2003) (citing Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000)).  Alternatively, a reasonable factfinder could find that Plaintiff's characterization of the nature of the instrumentation specialist job was more fluid than Defendant describes, and that permitting him to remain in that capacity, in the laboratory in Rotterdam, with rest breaks and no travel or heavy lifting, would have been a reasonable accommodation.  See Petrosky v. N.Y. State Dep't of Motor Vehicles, 72 F. Supp. 2d 39, 60 (N.D.N.Y. 1999) ("The reasonableness of accommodations is generally a question of fact.") (citing Haschmann v. Time Warner Entm't Co., 151 F.3d 591, 601 (7th Cir. 1998); Aquinas v. Fed. Express Corp., 940 F. Supp. 73, 79 (S.D.N.Y. 1996)) (other citations omitted).  Accordingly,

summary judgment on Plaintiff's disability discrimination claims is denied.

### B. Age Discrimination Claims

Historically, the McDonnell-Douglas framework articulated above also applied to ADEA claims. See, e.g., Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003). However, in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 129 S. Ct. 2343 (2009), the Supreme Court held that the plain language of the ADEA requires that an employee plaintiff "retain[] the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." 557 U.S. at __, 129 S. Ct. at 2351. Gross left open the question of whether the McDonnell-Douglas framework is appropriate in the ADEA context, id. at 2349 n.2, but the Second Circuit has continued to apply the framework in ADEA cases. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).[4]

Thus, Plaintiff must first establish a *prima facie* case of age discrimination by showing that he was: (1) within the protected age group; (2) qualified for the position; (3) suffered an adverse employment action; and (4) that such adverse employment action occurred under circumstances giving rise to an inference of discrimination." Terry, 336 F.3d at 137-38. If Defendant can then articulate a legitimate, nondiscriminatory reason for the adverse action, Plaintiff must then show that this proffered reason is pretextual and that "age was the 'but-for' cause of" Defendant's decision to terminate his employment. Id. at 106-07. In other words, "the employee must raise facts

---

[4] Although it is still an open question in this Circuit whether the new standard in Gross also applies to NYSHRL age discrimination claims, the Court notes that other district courts have found it appropriate to apply the Gross standard to both claims. See Fagan v. U.S. Carpet Installation, 770 F. Supp. 2d 490, 494-95 (E.D.N.Y. 2011); Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 506 (S.D.N.Y. 2010) (noting that "[t]he case for applying the mix-motive test in NYSHRL cases is arguably weaker" than for applying it in New York City Human Rights Law cases "because the NYSHRL does not have the same history of liberal construction"). Regardless, as discussed below, Plaintiff has failed to adduce evidence that would enable a reasonable jury to find that age was a motivating factor in Defendant's decision to terminate Plaintiff, let alone to find that it was the "but-for" cause of that decision.

from which rational jurors could decide that the employee was subject to the adverse employment action "'*because of* such individual's age.'" Papalia v. Milrose Consultants, Inc., No. 09 Civ. 9257, 2011 WL 6937601, at *8 (S.D.N.Y. Dec. 29, 2011) (quoting 29 U.S.C. § 623(a)(1)) (emphasis in original).

As with the disability claims, Defendant contests only the "qualification" prong of Plaintiff's *prima facie* case of age discrimination. While the Second Circuit has not explicitly addressed this issue, Defendant argues that the Court should apply the reasoning of other Circuits that have held that "[t]he ADEA's requirement that a plaintiff be 'qualified' for the position in question is absolute – there is no 'reasonable accommodation' concept in the ADEA." Def.'s Mem. at 8 (citing Johnson v. ExxonMobil Corp., 426 F.3d 887, 893 (7th Cir. 2005); Detz v. Greiner Indus., Inc., 346 F.3d 109, 117 (3d Cir. 2003)). However, the Court need not address this question, because even if Plaintiff could meet his initial burden of establishing a *prima facie* case of age discrimination, (1) Defendant has carried its burden of establishing a nondiscriminatory motive, namely, that the medical restrictions prescribed by Plaintiff's doctors conflicted with the essential functions of Plaintiff's job, see Zilinski v. Earth Tech, 572 F. Supp. 2d 214, 220 (D. Conn. 2008), vacated on other grounds on reconsideration by No. 3:06-cv-1512, 2008 WL 4820990 (D. Conn. Nov. 3, 2008); and (2) Plaintiff in turn has failed to establish sufficient facts to support an inference either that he was terminated because of his age or even that age was a motivating factor in his termination.

Plaintiff advances the following in support of his argument that he was terminated because of his age: (1) Karpishka's alleged statement to Plaintiff that he could not replace Scott Kaine in the laboratory because "they need somebody younger to do heavy lifting," followed by Granite's hiring a younger man than Plaintiff for the position; (2) a former supervisor's comment in a 2005

performance evaluation of Plaintiff that "[t]here have been some concerns raised in the last year that due to age and physical condition [Schumacher] may not be able to withstand the rigors of field testing"; and (3) a December 5, 2006 e-mail from Bryan Smith to Travis Mueller, the individual who ultimately decided to fire Plaintiff in May 2007, stating that "rumor has it, [Plaintiff] will retire at the first of the year." Pl.'s Opp. Mem. at 13-14.

       The Court finds that the latter two pieces of evidence cited by Plaintiff are insufficient to create a genuine dispute of material fact as to his age discrimination claims. Respecting the 2005 performance evaluation, the Court notes that, in its Opposition, Plaintiff failed to include the entire relevant quote from the 2005 performance evaluation, which actually stated: "There have been some concerns raised in the last year that due to age and physical condition [Schumacher] may not be able to withstand the rigors of field testing. *This has proven not to be the case*." Pl.'s Ex. X (Dkt. No. 37-23) at 1 (emphasis added). Without anything further to indicate who may have expressed "concerns" about Plaintiff's age, and mindful that this evaluation was given two years before Plaintiff was fired, the Court finds that this evaluation does little to establish discriminatory animus against Plaintiff. Similarly, Smith's December 2006 e-mail to Mueller, mentioning that it was rumored Plaintiff would retire soon, was sent shortly before Mueller actually decided to rehire Plaintiff as a Granite employee. Even if these statements could be deemed discriminatory, they are "stray remarks" at best and in no way "show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 116 (2d Cir. 2007). As such, they are insufficient to preclude summary judgment of Plaintiff's age discrimination claim.

       Further, Karpishka's remark to Plaintiff during the termination meeting, if true, is age-

-16-

related and might "arguably constitute some evidence of discrimination." Emanuel v. Oliver, Wyman & Co., LLC, 85 F. Supp. 2d 321, 329 (S.D.N.Y. 2000). However, Plaintiff does not dispute here that Mueller, not Karpishka, was the one who actually made the decision to fire Schumacher. Pl.'s Opp. Mem. at 14. And indeed, Mueller is also the one who decided only six months earlier to offer Plaintiff a job with Granite, which gives rise to an inference that his later decision to terminate Plaintiff was *not* motivated by a discriminatory animus. See Carlton v. Mystic Transp., 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.") (citation and quotation omitted); Szostak v. Modern Landfill, Inc., No. 99:CV-0171E, 2001 WL 1823606 (W.D.N.Y. Dec. 18, 2001) (applying "same actor inference" where the decision to fire plaintiff was made by the same individual who had rehired him only three months prior). For all of the above reasons, Defendant is entitled to summary judgment on Plaintiff's claims of age discrimination under the ADEA and NYSHRL.

V.     **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion for summary judgment (Dkt. No. 33) is **GRANTED** in part and **DENIED** in part, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that summary judgment be **GRANTED** with respect to Plaintiff's age discrimination claims pursuant to the Age Discrimination in Employment Act and the New York State Human Rights Law ("NYSHRL"); however, summary judgment is **DENIED** with respect to Plaintiff's disability discrimination claims pursuant to the Americans with Disabilities Act and the NYSHRL; and it is further

      **ORDERED**, that the Clerk serve a copy of this Order on the parties.

      **IT IS SO ORDERED.**

DATED:     March 20, 2012
              Albany, New York

                                        Lawrence E. Kahn
                                        U.S. District Judge